OPINION
{¶ 1} This case involves a determination of when a cause of action accrues in the rare instance where it is alleged that a single traumatic event occasioned by medical negligence caused both immediately apparent injury and an unpredictable latent disease in the patient.
 {¶ 2} Plaintiff-appellant, Carol K. Girardi ("appellant") appeals the May 4, 2005 judgment of the Franklin County Court of Common Pleas, in which that court granted summary judgment in favor of defendants-appellees, Beth A. Boyles, M.D. ("Dr. Boyles") and Ronda Gaiser, M.D. ("Dr. Gaiser),[1] and dismissed appellant's claims. The basis of the trial court's decision was its conclusion that appellant's cause of action is barred by the applicable statute of limitations.
 {¶ 3} The facts pertinent to the issues raised by this appeal are undisputed. On May 11, 1998, appellant attended a scheduled appointment with her regular gynecologist, Dr. Boyles, because appellant had been experiencing excessive and painful menstrual bleeding and severe symptoms of premenstrual syndrome. Dr. Boyles advised that appellant undergo a procedure called a laparoscopic-assisted vaginal hysterectomy with bilateral salpingo-oophorectomy. This procedure involves removal of the uterus, both fallopian tubes and both ovaries. Appellees performed the surgery on June 8, 1998.
 {¶ 4} Dr. Boyles' operative report reveals that, following incision of the pericervical tissue, appellees observed "a large amount of clear fluid * * * present in the posterior cul-de-sac."[2] Later, appellees discovered an 8- to 10-centimeter irregular mass behind the left ovary. Dr. Boyles wrote that the mass "appeared to be the source of the fluid that was described previously."[3] Appellees removed the mass and "[t]he cavity was irrigated as well as possible."[4]
Appellees sent the mass to a laboratory for analysis. The pathologist's diagnosis with respect to the left ovary was, "Atypical proliferating mucinous tumor (mucinous tumor of low malignant potential)."[5]
 {¶ 5} Dr. Boyles delivered these pathology results to appellant, and recommended that appellant consult Dr. Jeffrey Bell, M.D. ("Dr. Bell"), a local gynecologic cancer specialist. Appellant's husband, who is a medical doctor, telephoned Dr. Bell, who advised that tumors of low malignant potential ("LMP") are not "anything to worry about," that they have a three to five percent chance of developing into cancer, and that if "it was [Dr. Bell's] wife, he wouldn't do anything."[6]
 {¶ 6} Following the discussion with Dr. Bell, appellant and her husband decided to consult Dr. Larry Copeland, M.D. ("Dr. Copeland"), who is a gynecologic oncologist at the Ohio State University Medical Center's Arthur G. James Cancer Hospital ("the James"). Appellant first saw Dr. Copeland in July 1998, at which time Dr. Copeland advised appellant that the LMP tumor had likely ruptured during the 1998 surgery.[7] Dr. Copeland further advised that he would need to examine appellant, and test her blood for tumor markers, every three months.
 {¶ 7} On October 12, 1998, appellant attended her first 3-month check-up with Dr. Copeland. Upon examination, Dr. Copeland found a pelvic mass and advised that the LMP tumor had reappeared. On October 15, 1998, Dr. Copeland removed this mass, along with certain lymph nodes and multiple peritoneal tissue samples for purposes of conducting staging biopsies.[8]
Laboratory analysis revealed that the pelvic mass was a "mucinous borderline tumor" and that no malignancies were observed in any of the tissue samples.[9]
 {¶ 8} Appellant continued to attend appointments with Dr. Copeland on an every-three-months basis throughout the remainder of 1998, and through the years 1999 and 2000, none of which revealed any reoccurrence of the LMP mass. Beginning in 2001, Dr. Copeland lengthened the time period between examinations to six months.
 {¶ 9} On May 15, 2002, Dr. Copeland again detected a pelvic mass. On that date, he obtained 16 tissue samples and sent them to the laboratory at the James for analysis. Dr. Wendy L. Frankel, M.D., performed the laboratory analysis, and diagnosed adenocarcinoma[10] in the samples taken from numerous areas within appellant's abdomen.[11] Dr. Nilsa Ramirez, M.D., reviewed select sections and concurred with Dr. Frankel's conclusions. Shortly thereafter, Dr. Copeland advised appellant that he believed that her cancer developed from cells that remained in her abdomen following the rupture of the LMP tumor that appellees removed in June 1998. On March 14, 2003 — less than one year later — appellant commenced the instant action.
 {¶ 10} Appellant's complaint states claims for medical negligence. The alleged negligence upon which appellant bases her claims is appellees' "failure to properly and appropriately conduct Plaintiff's surgical procedure, resulting in a spillage of malignancy in Plaintiff's abdominal cavity."[12] She further alleges that, "[a]s a direct and proximate result of [appellees' negligent medical treatment] * * * Plaintiff has suffered * * * a severe and significant worsening of her medical condition."[13]
 {¶ 11} On December 6, 2004, appellees filed their motion for summary judgment. On April 8, 2005, the trial court journalized a decision granting the motion. Applying the discovery rule to determine when appellant's cause of action accrued, the court found that the cognizable event that triggered the running of the statute of limitations against appellant's negligence claims occurred in October 1998 when Dr. Copeland advised appellant that the LMP tumor had reoccurred. The court explained that, "Plaintiff did not need to know or recognize the extent of her injuries. * * * [Rather,] [o]nce Plaintiff realized that the October 1998 reoccurrence of her pre-cancerous tumor was a result of the June 1998 procedure, and that it could later possibly develop into actual cancer, however remote that possibility was, she was alerted or should have been alerted that an improper medical procedure or treatment had occurred."[14]
 {¶ 12} Appellant asserts a single assignment of error for our review, as follows:
THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF IN GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, RULING AS A MATTER OF LAW PLAINTIFF'S ACTION WAS BARRED BY THE EXPIRATION OF THE STATUTE OF LIMITATIONS FOR MEDICAL MALPRACTICE ACTIONS.
 {¶ 13} We begin by recalling the standards applicable to our review of a trial court's grant of summary judgment. We review the trial court's grant of summary judgment de novo. CoventryTwp. v. Ecker (1995), 101 Ohio App.3d 38, 654 N.E.2d 1327. Summary judgment is proper only when the party moving for summary judgment demonstrates: (1) no genuine issue of material fact exists, (2) the moving parties are entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, when the evidence is construed in a light most favorable to the nonmoving party. Civ.R. 56(C); State ex rel. Grady v. State Emp. Rels. Bd.
(1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343. We construe the facts gleaned from the record in a light most favorable to appellant, as is appropriate on review of a summary judgment. We review questions of law de novo. Nationwide Mut. Fire Ins. Co.v. Guman Bros. Farm (1995), 73 Ohio St.3d 107, 108,652 N.E.2d 684, citing Ohio Bell Tel. Co. v. Pub. Util. Comm. (1992),64 Ohio St.3d 145, 147, 593 N.E.2d 286.
 {¶ 14} As it comes before this court, the issue to be determined is whether appellant's cause of action accrued in October 1998, when she became aware that her LMP tumor had returned and that its reoccurrence was caused by appellees' alleged negligence, or in May 2002, when appellant became aware that she had adenocarcinoma caused by such negligence. Our determination is appropriately made with reference to the purposes underlying statutes of limitations. "The rationale underlying statutes of limitations is fourfold: to ensure fairness to defendant; to encourage prompt prosecution of causes of action; to suppress stale and fraudulent claims; and to avoid the inconvenience engendered by delay, specifically the difficulties of proof present in older cases." O'Stricker v. JimWalter Corp. (1983), 4 Ohio St.3d 84, 88, 4 OBR 335,447 N.E.2d 727.
 {¶ 15} The statute that governs the accrual of appellant's cause of action is R.C. 2305.113, which was formerly codified at R.C. 2305.11(B).[15] That statute provides, "[e]xcept as otherwise provided in this section, an action upon a medical, dental, optometric, or chiropractic claim shall be commenced within one year after the cause of action accrued." R.C.2305.113(A).[16] The Ohio Revised Code does not define the term "accrued" as the same is used in this statute. Therefore, it is left to the judiciary to determine when a cause of action accrued. O'Stricker, supra, paragraph one of the syllabus.
 {¶ 16} Generally, a cause of action for negligence accrues at the time the wrongful act is committed. Id. at 87. However, for many years, the courts of Ohio eschewed this general principle in medical negligence cases and consistently adhered to the "termination rule," which provided that the termination of the physician-patient relationship is the event that commences the running of the statute of limitations in such cases. Oliver v.Kaiser Community Health Found. (1983), 5 Ohio St.3d 111, 113, 5 OBR 247, 449 N.E.2d 438.
 {¶ 17} The Supreme Court of Ohio first applied the so-called "discovery rule" to a medical negligence case in Melnyk v.Cleveland Clinic (1972), 32 Ohio St.2d 198, 61 O.O.2d 430,290 N.E.2d 916, a case in which a patient discovered that a surgeon had left a forceps and a sponge inside the patient's body during a surgery performed ten years earlier. The Melnyk court held that, in such a case, "the running of the statute of limitation governing a claim therefor is tolled until the patient discovers, or by the exercise of reasonable diligence should have discovered, the negligent act." Id. at syllabus. In so holding, the court emphasized the specific facts of the case, noting that, "[t]o carelessly leave a large and obvious metallic forceps and a nonabsorbent sponge in a surgical patient's body is negligence as a matter of law, and the proof thereof is generally unsusceptible to speculation or error." Id. at 200. The Melnyk court thus viewed the traditional rationale for strict application of the statute of limitations — avoidance of stale claims with their concomitant difficulties of proof — as largely inapplicable to the facts of that case.
 {¶ 18} Later, with its decision in Oliver, supra, the Supreme Court of Ohio abandoned the "termination rule" and adopted the "discovery rule" for medical negligence cases not involving foreign objects but in which the wrongful act likewise does not result in harm that the patient can immediately apprehend. The court held, "a cause of action for medical malpractice accrues and the statute of limitations commences to run when a patient discovers, or, in the exercise of reasonable care and diligence should have discovered, the resulting injury." Id. at syllabus. The Oliver court noted that application of the discovery rule "eases the unconscionable result to innocent victims who by exercising even the highest degree of care could not have discovered the cited wrong." Id. at 114.
 {¶ 19} In Hershberger v. Akron City Hosp. (1987),34 Ohio St.3d 1, 516 N.E.2d 204, the court explained the holding inOliver, and set forth a three-prong analysis for Ohio trial courts to use in determining the accrual date for medical malpractice claims. In Hershberger, the Supreme Court of Ohio held:
In a medical malpractice action, for the purposes of determining the accrual date in applying the statute of limitations under R.C. 2305.11(A), the trial court must look to the facts of the particular case and make the following determinations: when the injured party became aware, or should have become aware, of the extent and seriousness of his condition; whether the injured party was aware, or should have been aware, that such condition was related to a specific professional medical service previously rendered him; and whether such condition would put a reasonable person on notice of need for further inquiry as to the cause of such condition. * * *
Id. at syllabus.
 {¶ 20} Later, in the case of Allenius v. Thomas (1989),42 Ohio St.3d 131, 538 N.E.2d 93, the court explained the phrase "extent and seriousness of his condition" and refined theHershberger test. The Allenius court noted that "`extent and seriousness' are not terms of art and, therefore, do not lend themselves to easily discernible definitions." Id. at 133. However, the court attempted to clarify this language and held that Hershberger "requires that there be an occurrence of a `cognizable event' which does or should lead the patient to believe that the condition of which the patient complains is related to a medical procedure, treatment or diagnosis previously rendered to the patient and where the cognizable event does or should place the patient on notice of the need to pursue his possible remedies." Id. at syllabus.
 {¶ 21} The Allenius court apparently recognized that in attempting to clarify the court's earlier verbiage, it was adopting language that was also likely to result in disagreement and confusion in some cases. The court remarked, "[w]e recognize that the term `cognizable event' will be criticized as a malleable term. This is understandable, but unfortunate. By their very nature such terms are difficult to specifically define." Id. at 134, fn.2. In spite of such inherent difficulties, the court defined "cognizable event" as "some noteworthy event * * * which does or should alert a reasonable person-patient that an improper medical procedure, treatment or diagnosis has taken place." Id. at 134. The court further noted that "a patient [need not] be aware of the full extent of the injury before there is a cognizable event." Id. at 133-134. (Emphasis sic.) Later, in the case of Flowers v. Walker (1992), 63 Ohio St.3d 546,589 N.E.2d 1284, the court reaffirmed this notion, holding that "[a] plaintiff need not have discovered all the relevant facts necessary to file a claim in order to trigger the statute of limitations." Id. at 549.
 {¶ 22} In the instant case, in light of the foregoing definition of "cognizable event," the trial court viewed the October 1998 reoccurrence of appellant's LMP tumor as the "noteworthy event" that should have put appellant on notice that appellees had invaded appellant's right to be free from negligent medical care. The court further viewed appellant's adenocarcinoma as but a fuller manifestation of the same injury allegedly inflicted upon appellant during the June 1998 surgery.
 {¶ 23} In support of her assignment of error, appellant argues that the only "injury" for which she seeks damages is her adenocarcinoma and, therefore, any "injuries" she may have suffered as a result of the reoccurrence of the LMP in 1998 (such as, for example, the out-of-pocket costs associated with the October 1998 surgery) are irrelevant. She directs our attention to language within the syllabus of Allenius, in which the court states that the "cognizable event" that marks the accrual of the cause of action is an event "which does or should lead the patient to believe that the condition of which the patientcomplains is related to" the defendant's alleged negligence. (Emphasis added.) Appellant argues that because the "condition of which [she] complains" is her cancer — not a recurrent LMP mass — the court should have found that the cognizable event that commenced the running of the statute of limitations against her claim was the diagnosis of cancer in May 2002. This was, she urges, the earliest date upon which she knew or could have known that she had developed cancer.
 {¶ 24} Dr. Boyles testified that the LMP mass detected in June 1998 was not cancer.[17] Further, it is undisputed that the possibility of the LMP mass developing into cancer was remote. Thus, appellant argues, it was unreasonable for the trial court to characterize appellant's October 1998 LMP tumor and her 2002 adenocarcinoma as but varying degrees of the same injury. Moreover, appellant points out, if she had filed suit against appellees within one year of the October 1998 return of her LMP tumor, she could not have recovered for fear that she would develop cancer.
 {¶ 25} Appellees, on the other hand, urge this court to focus not on the nature of the harm for which appellant seeks to recover damages, but on the first point in time that appellant was apprised that some part of her medical care may have been rendered in a negligent manner. This date — October 1998 — was the first date upon which, according to appellees, "[a]ppellant was on notice of the allegedly substandard acts and omissions that would ultimately form the basis of her complaint."[18]
Like the trial court, appellees characterize appellant's cancer diagnosis not as a separate injury distinct from the reoccurrence of her LMP tumor, but, rather, as but the "fullest manifestation of her injury".[19] Under Allenius, appellees argue, appellant did not need to be aware of her cancer in order to be on notice as to the possibility that she had received improper medical care.
 {¶ 26} The parties' opposing positions illustrate a sharp divergence of approach to application of the discovery rule in tort cases involving latent or insidious diseases, and those involving more than one medical condition resulting from a single act of negligence. The question of precisely how to apply the discovery rule in such cases has not heretofore been addressed with great frequency or depth in Ohio courts.
 {¶ 27} The parties devote a substantial portion of their briefs to the case of Salyer v. Riverside United MethodistHosp., 10th Dist. No. 01AP-1196, 2002-Ohio-3068. In that case, it was alleged that the defendant had negligently miscalculated the radiation output of a radiation therapy unit with which it had treated the plaintiff for testicular cancer, and as a result, subjected the plaintiff to poisonous levels of radiation that caused him to suffer numerous maladies. During his radiation therapy, which ended on January 21, 1976, the plaintiff experienced intense pain in the irradiated areas of his body, at least one open wound, and burned skin that became indurated and permanently discolored. The plaintiff suspected he was suffering from radiation poisoning and, after informing his treating physician of such, the physician reduced the dosage for the remaining treatments.
 {¶ 28} During a follow-up visit later in 1976, the physician informed the plaintiff that he had received more radiation than had been intended and that this could result in scarring, fibrosis or both. In fact, scar tissue had formed in the plaintiff's abdomen, which caused pain, discomfort and muscle cramps. The scar tissue also pushed air from his lungs when he bent over, resulting in the plaintiff having difficulties performing his job duties, which involved frequent bending. Within one year of his last radiation treatment, the plaintiff became aware, through news reports, that other radiation overdoses had occurred at the same hospital, and he further learned that some of these other patients had brought lawsuits as a result. He even conferred with his own attorney regarding his situation but chose not to pursue litigation at that time. The plaintiff did not file suit until after he was diagnosed in 1996 with bone disintegration in his low back and hip and was informed that this condition was related to his previous radiation exposure.
 {¶ 29} Citing as authority the O'Stricker, Oliver,Hershberger, Allenius and Flowers cases, this court affirmed the trial court's grant of summary judgment in favor of the defendants. We rejected the plaintiff's argument that his cause of action for negligence based upon his radiation overdose did not accrue until he was informed that bone disintegration in his back and hip were related to his previous radiation exposure. We explained:
[a]lthough plaintiff may not have become aware of the full extent of his injuries related to past radiation overexposure until November 1996, as early as 1976 Dr. Andresen informed plaintiff that plaintiff had received radiation overexposure and potential problems from it. * * *
Here, unlike a plaintiff with a disease, such as asbestosis, mesothelioma, lung cancer, or squamous cell carcinoma of the larynx that may manifest itself many years after asbestos exposure, * * * plaintiff possessed the critical facts: he knew he had been hurt and knew who had inflicted the injury as early as 1976.
Id. at ¶ 17-19.
 {¶ 30} Appellees argue that the Salyer case is applicable herein, and that appellant's October 1998 discovery that her LMP tumor had returned is analogous to the Salyer plaintiff's discovery in 1976 that he had been exposed to dangerous levels of radiation. Appellant argues that this case is not applicable to the case at bar because the plaintiff in Salyer not only knew about the injurious exposure within months of receiving it, but also suffered serious adverse physical effects even before the course of treatment was complete. On the other hand, appellant argues, the condition for which appellant seeks recovery is a condition that she could not have known would develop and did not develop until nearly four years after appellees' alleged negligent acts. In appellant's words, she would have required "a crystal ball"[20] to ascertain that she would develop cancer, whereas the plaintiff in Salyer knew he was suffering from persistent, progressive health problems as a result of admitted negligence, and simply slept on his rights.
 {¶ 31} In our view, Salyer is not particularly applicable to the dilemma of how to apply the discovery rule to this case. The plaintiff in Salyer suffered from a continuous course of physical problems that began before the conclusion of the negligently rendered medical treatment and persisted for 20 years. As the Salyer court itself pointed out, that case did not involve an insidious, latent disease that manifests itself years after injurious exposure to the disease-causing agent.
 {¶ 32} Our research reveals no Ohio case, other thanSalyer, in which the statute of limitations was at issue where a plaintiff alleged that a medical professional negligently exposed the plaintiff to a latent disease-causing agent. Most of the Ohio cases in which the discovery rule is applied to latent disease claims involve exposure to asbestos. One such case is the aforementioned O'Stricker v. Jim Walter Corp. (1983),4 Ohio St.3d 84, 4 OBR 335, 447 N.E.2d 727. That case, along with the case of Liddell v. SCA Services of Ohio, Inc. (1994),70 Ohio St.3d 6, 635 N.E.2d 1233, which involved poisonous gas and followed O'Stricker, is dispositive of the issue of the date of accrual of appellant's cause of action.
 {¶ 33} In O'Stricker, the plaintiff had for years been exposed to asbestos, a known carcinogen, while working as a fireproofer. The plaintiff had last been exposed to asbestos in 1973 and began to experience shortness of breath, loss of balance, difficulty swallowing, and hoarseness sometime prior to late 1978. At that time a physician informed the plaintiff of the possible relation between his symptoms and his exposure to asbestos. In mid-1979, the plaintiff was diagnosed with squamous cell carcinoma of the larynx, and his larynx was completely removed later that year.
 {¶ 34} He filed suit against several asbestos manufacturers, and the trial court granted the defendants summary judgment, finding that the plaintiff's cause of action accrued upon the date of his last exposure to asbestos. The court of appeals likewise refused to apply the discovery rule.
 {¶ 35} The Supreme Court of Ohio reversed, explaining that, "[i]n general, a cause of action exists from the time the wrongful act was committed. However, in situations such as the case at bar, the application of the general rule `would lead to the unconscionable result that the injured party's right to recovery can be barred by the statute of limitations before he is even aware of its existence.'" Id. at 87, quoting Wyler v.Tripi (1971), 25 Ohio St.2d 164, 168, 54 O.O.2d 283,267 N.E.2d 419, overruled on other grounds by Oliver v. Kaiser CommunityHealth Found. (1983), 5 Ohio St.3d 111, 5 OBR 247,449 N.E.2d 438, at syllabus.
 {¶ 36} The O'Stricker court noted the rationale underlying all statutes of limitations:
To ensure fairness to defendant; to encourage prompt prosecution of causes of action; to suppress stale and fraudulent claims; and to avoid the inconvenience engendered by delay, specifically the difficulties of proof present in older cases.
O'Stricker, supra, at 88.
 {¶ 37} The court further noted that "prompt prosecution of claims cannot be engendered by a statute of limitations unreasonably short. Rather, such a statute would bar legitimate actions before the injury manifested itself." Id. at 89. Thus, the O'Stricker court held, "having in view the underlying rationale for statutes of limitations and the equities and public policy appropriate in such latent disease cases, this court believes a liberal interpretation of the time of accrual isappropriate in this and all actions alleging the infliction ofbodily injury which only manifests itself at a point subsequentto the alleged negligent conduct of defendant." Ibid at 90. (Emphasis added.)
 {¶ 38} In the more recent case of Liddell v. SCA Services ofOhio, Inc. (1994), 70 Ohio St.3d 6, 635 N.E.2d 1233, the Supreme Court of Ohio allowed a plaintiff to proceed when he sought recovery for the latent effects of toxic gas exposure, even though the toxic gas had caused him to suffer adverse health effects immediately following his exposure thereto.
 {¶ 39} The plaintiff in Liddell was a police officer who was exposed to a hazardous substance while responding to a report of a large fire on board a truck that was transporting the substance. On the day of the incident the plaintiff was treated at a hospital for smoke inhalation and reported a scratchy throat and burning, watering eyes. These symptoms abated by the next day.
 {¶ 40} The plaintiff filed a workers' compensation claim seeking coverage of his medical bills associated with the incident, and also applied for a permanent partial disability award as a result of inhalation of the fumes. Within nine months of his exposure to the toxic gas, the plaintiff began to experience frequent sinus infections. Six years after the exposure, the plaintiff underwent surgery to remove a benign papilloma from his left nasal cavity.
 {¶ 41} Then, one year after the first surgery, a biopsy revealed a cancerous growth in the plaintiff's left nasal cavity. At that time, the plaintiff's physician advised him that there might be a connection between his cancer and his inhalation of the toxic fumes seven years earlier. He subsequently underwent a complete facial degloving, which included removal of his left sinuses and part of his facial skeleton. He filed suit against the truck's owner within two years of being advised of the connection between his cancer and his inhalation of the toxic fumes.
 {¶ 42} The lower courts found that summary judgment in the defendant's favor was appropriate because the plaintiff had suffered adverse health consequences immediately upon being exposed to the toxic gas, and the plaintiff was, of course, aware of the exposure at the time it occurred. Thus, they concluded, the plaintiff's cause of action had accrued on the date of the truck fire. The Supreme Court of Ohio reversed, deeming the lower courts' view erroneous in light of the fact that "the cancer could not be, and was not, discovered until after the applicable statute of limitations governing causes of action for bodily injury had expired." Id. at 8.
 {¶ 43} The Liddell court recognized that "[s]tatutes of limitations cause particular problems in cases like the one before us today in which a latent injury cannot be detected before the applicable limitations period expires." Id. at 10. This is because latent injury claims do not fit neatly within the class of cases likely to unfairly prejudice defendants and against which statutes of limitations were intended to guard.
 {¶ 44} The Liddell court determined that it needed to "look no further than [O'Stricker] to resolve the issue facing us today. O'Stricker cogently outlines the reasons for adopting a discovery rule in latent disease cases." Liddell, at 12. The unanimous court in Liddell was apparently wholly untroubled by the fact that the plaintiff had immediately experienced adverse health effects from his exposure to the toxic gas, filed a workers' compensation claim arising out of his inhalation of the fumes, and later underwent removal of a benign nasal papilloma in the same region in which his cancer was later discovered. Instead, the court focused on the condition of which Liddell complained; that is, his cancer. The court stated:
Consistent with our reasoning in O'Stricker, this case does not represent the circumstance of a plaintiff sitting on his rights. Liddell could not, and did not, discover his injury, the cancer, before the two-year statute of limitations governing bodily injuries had expired. Moreover, had Liddell attempted to bring a cause of action for negligence in 1981, any specification of damages for cancer certainly would have been strongly opposed by SCA on the grounds that they were too speculative. Hence, under SCA's theory Liddell would be confronted with a dilemma. He could either meet the statute of limitations and file a claim for compensation more than four years before he discovered the disease, or, as he did here, file a claim at the time of discovery, which occurred more than four years after the statute of limitations had expired.
Id. at 13. (Emphasis sic.)
 {¶ 45} The Ninth District Court of Appeals relied uponO'Stricker and Liddell in reversing a summary judgment entered in favor of the defendants in a products liability case in which the plaintiff suffered permanent disfigurement. In the case of Davis v. Johnson Publishing Co. (1996), 9th Dist. No. C.A. 17688, discretionary appeal not allowed (1997),78 Ohio St.3d 1429, 676 N.E.2d 534, the plaintiff's face became irritated and swollen a few days after she began using the defendant's facial cleanser. Several weeks later she sought treatment in a hospital emergency room for red, itchy and irritated skin, and told her doctors that her irritation was caused by the cleanser. A physician told her that her skin irritation was due to a "makeup reaction."
 {¶ 46} Two weeks later she again visited the emergency room because she was suffering from erythema and edema of the face. The swelling and irritation abated, but after two more weeks had elapsed, the plaintiff noticed darkening pigmentation in the areas upon which she had applied the cleanser. Six weeks later, a dermatologist informed the plaintiff that the cleanser caused these blemishes and that they were permanent. She sued the defendants more than two years after she had initially been told that the cleanser caused the irritation, but less than two years after she noticed the permanent darkened pigmentation.
 {¶ 47} In reversing the trial court's summary judgment on statute of limitations grounds, the court of appeals determined that the case was like Liddell because in both cases one event had yielded two distinct injuries; the first of the two had abated fairly quickly and the second, more serious injury had not manifested itself until well after the initial insult to the body had occurred. The court determined that the irritation and swelling that the plaintiff experienced was a separate and distinct injury from the permanently changed pigmentation of her face. The court reversed summary judgment and remanded for trial, holding that a genuine issue of fact existed as to the date of accrual of the cause of action.
 {¶ 48} The California case of Martinez-Ferrer v.Richardson-Merrell, Inc. (1980), 105 Cal.App.3d 316,164 Cal.Rptr. 591, is also instructive.[21] In that case, California's Second Appellate District dealt with the issue of when a cause of action for negligence accrues where the plaintiff suffers relatively minor injuries immediately after experiencing a bodily insult or injury caused by the defendant's negligence, and also suffers serious latent injuries that are causally related to that negligence but that the plaintiff could not, in the exercise of reasonable diligence, have predicted.
 {¶ 49} In Martinez-Ferrer, the plaintiff, who was a medical doctor, took a cholesterol drug manufactured by the defendant. Within a few months, he experienced sudden vision deterioration and dermatitis covering his entire body that was so severe that the plaintiff could not work for several weeks. The plaintiff's doctors concluded that the cholesterol drug was the likely cause of these problems. The symptoms abated shortly after the plaintiff ceased taking the drug. He saw an ophthalmologist every two to three years. This specialist perceived no problems with the plaintiff's eyes until, 16 years after the plaintiff initially experienced problems from the cholesterol drug, it was discovered that he had developed cataracts. His ophthalmologist opined that the cataracts were permanent and were caused by the cholesterol drug. The plaintiff filed suit soon afterward.
 {¶ 50} The trial court granted summary judgment in favor of the drug manufacturer, finding that the plaintiff's cause of action accrued when, 16 years earlier, he experienced some bodily injuries — temporary vision loss and dermatitis — as a result of taking the defendant's drug. The court of appeals noted that this point of view is "rooted in the traditional concept of what constitutes a cause of action for personal injuries" that holds:
As a general rule, where an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attaches at once. It is not material that all the damages resulting from the act shall have been sustained at that time, and the running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date * * *.
Id. at 323, citing 34 American Jurisprudence 126, Section 160.
 {¶ 51} However, noting the "injustice of the general rule if applied to the facts of this case", the court found that the plaintiff's cause of action accrued when he became aware of the existence of his cataracts and that they were causally related to his ingestion of the defendant's drug. The court determined that its decision advanced, rather than hindered, the policies underlying statutes of limitations, and explained its reasoning thusly:
The sad fact is that [plaintiff] would have been laughed out of court had he sued for dermatitis and macula edema when defendants say he should have — 1962 — and had he then attempted to be compensated for the speculative possibility that his 1960 ingestion of [the cholesterol drug] might cause cataracts before that chance became a fact in 1976. * * * [U]nder our statutory scheme * * * [plaintiff] would have been quite unable to keep his action alive for a decade and half. The simple fact is that rules developed against the relatively unsophisticated backdrops of barroom brawls, intersection collisions and slips and falls lose some of their relevance in these days of miracle drugs with their wondrous, unintended, unanticipated and frequently long-delayed side effects.
* * *
[R]ules defining a cause of action for personal injuries in cases involving straightforward trauma do not necessarily fit all cases in an age where * * * products * * * designed to alleviate human suffering * * * but which, years and even decades later cause serious disabling or even life-threatening injuries. * * * [I]t advances no coherent public policy to absolve [the defendant] of * * * liability simply because right after the ingestion of the drug the user suffered other, different, independent and relatively innocuous side effects for which he did not bother to sue.
Id. at 323-324.
 {¶ 52} The foregoing rationale, and that employed inO'Stricker and Liddell, applies with equal force to the case before us. Here, appellant was not simply ignorant of the extent of her injury; she was blamelessly ignorant of any actionable cancer-related injury until May 2002. Her cancer was not a mere aggravation of a time-barred injury; it was a distinct and separate injury caused by the alleged negligence that occurred four years earlier. Prior to May 2002, appellant's cancer was inherently unknowable. The best evidence of the undiscoverable quality of this condition is the fact that it was not discovered until mid-2002, despite appellant's diligent efforts in having a reoccurring LMP growth removed to ward off the development of carcinoma, and in rigidly adhering to her physician's monitoring and diagnostic testing schedule for three and one-half years.
 {¶ 53} "In Ohio, a plaintiff is entitled to an award of damages to compensate him for losses which he is reasonablycertain to incur in the future." Galayda v. Lake Hosp. Sys.
(1994), 71 Ohio St.3d 421, 425, 644 N.E.2d 298. (Emphasis added.) At the time appellant discovered the reoccurrence of her LMP tumor in October 2002, she could not have maintained a cause of action for having actually developed cancer because she did not have cancer and had little chance of ever developing it. It is doubtful that she could have carried the burden of proving by a preponderance of the evidence that it was more likely than not that she would develop cancer. She likewise would not have been able to demonstrate with reasonable certainty what her damages would be, or how they should be quantified. Moreover, she could not have maintained an action for fear of cancer. See Dobran v.Franciscan Med. Center, 102 Ohio St.3d 54, 2004-Ohio-1883,806 N.E.2d 537 (holding that one's fear of metastasis of cancer, in the absence of immediate risk of physical harm, does not support a negligence action.) Thus, to hold that appellant's cause of action is time-barred would do violence to the very purposes underlying statutes of limitation. This is because a plaintiff who could not have known of her cause of action cannot be deemed to have slumbered on her rights.
 {¶ 54} Additionally, allowing the statute of limitations to run against appellant's latent disease-related claim separately from that which ran against her claim for the comparably minor injury she suffered as a result of the tumor reoccurrence benefits defendants and the already heavily burdened judicial system by "deterring uneconomical anticipatory lawsuits." Wilsonv. Johns-Manville Sales Corp. (D.C. Cir. 1982), 221 U.S. App. D.C. 337, 684 F.2d 111, 120 (applying the discovery rule to permit pursuit of a claim for mesothelioma that manifested itself five years after the plaintiff discovered he suffered from asbestosis caused by the same injurious exposure).
 {¶ 55} The interest in deterring pursuit of premature and speculative claims, together with the diligent plaintiff's interest in securing compensation for serious harm, outweighs the interest in repose in a case such as this, in which a single act of medical negligence almost immediately results in a relatively minor injury and later, after the statute of limitations has expired on the first injury, results in the development of a serious and theretofore inherently unknowable disease.
 {¶ 56} Therefore, we find that appellant's cancer was not merely an increase in severity of the recurrent LMP tumor; rather, the cancer was a distinct invasion of a legally protected interest, and thus a separate injury, the statute of limitations for which began to run on May 15, 2002, the date upon which appellant became aware of her cancer. Accordingly, we find that appellant's cause of action accrued on May 15, 2002. She filed her lawsuit on March 14, 2003. Thus, under R.C. 2305.113, her action was timely filed.
 {¶ 57} For all of the foregoing reasons, appellant's single assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to that court for further proceedings consistent with law and with this opinion.
Judgment reversed; cause remanded.
Petree and Travis, JJ., concur.
[1] Drs. Boyles and Gaiser will be referred to collectively hereinafter as "appellees."
[2] June 9, 1998 Operative Record, page 2.
[3] Ibid.
[4] Ibid.
[5] Ibid.
[6] Deposition of appellant, page 38.
[7] Affidavit of appellant, ¶ 5.
[8] October 20, 1998 Operative Report of Dr. Copeland.
[9] October 16, 1998 Surgical Pathology Report of Dr. Filiberto Cavazos, M.D.
[10] "Carcinoma" is defined as, "a malignant new growth made up of epithelial cells tending to infiltrate the surrounding tissues and give rise to metastases." The Sloane-Dorland Annotated Medical-Legal Dictionary (1987) 113. "Adenocarcinoma" is defined as, "carcinoma derived from glandular tissue or in which the tumor cells form recognizable glandular structures." Id. at 11.
[11] May 20, 2002 Surgical Pathology Report of Dr. Wendy L. Frankel, M.D.
[12] Complaint, ¶ 8.
[13] Id. at ¶ 9.
[14] April 8, 2005 Decision Granting Defendants' Motion for Summary Judgment, page 8.
[15] The statute was recodified by passage of S.B. 281, which became effective on April 11, 2003. The substantive provisions of the statute remained unchanged.
[16] This section was formerly codified as R.C. 2305.11(B)(1).
[17] Deposition of Dr. Boyles, 45-46.
[18] Brief of Appellees, 12.
[19] Ibid.
[20] Brief of appellant, 9.
[21] We note that the Supreme Court of Ohio in Allenius v.Thomas (1989), 42 Ohio St.3d 131, 538 N.E.2d 93, looked to several California cases identifying the contours of the term "cognizable event" for purposes of applying the discovery rule in that latent disease-related medical malpractice claim. See id. at 134. See, also, id. at 135 (Moyer, J., concurring).